IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ADAM HARRY DENNEY, | : | CIVIL ACTION NO. |
| Movant, | : | 1:09-cv-1717-JEC |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 1:06-cr-406-JEC-3 |
| | : | |
| UNITED STATES OF AMERICA, | : | MOTION TO VACATE |
| Respondent. | : | 28 U.S.C. § 2255 |

**ORDER AND OPINION**

Moving under 28 U.S.C. § 2255, Adam Harry Denney challenges his sentence, imposed by this Court following a jury's verdict of guilty on two of the three criminal counts in which he was charged. Albeit the movant, Denney will be referred to as the defendant, as this was his status in the underlying criminal proceedings that have given rise to this motion. Defendant argues that his retained trial counsel, Mr. Joseph Siciliano, rendered ineffective assistance that created prejudice, because it resulted in the imposition of a higher sentence than defendant would otherwise have received had the legal assistance been adequate. Specifically, defendant argues that, but for counsel's ineffective assistance, he would have pled guilty (and thereby been eligible for a downward adjustment for acceptance of responsibility under the Sentencing Guidelines) and he would not have perjured himself at trial (and thereby received an upward adjustment at sentencing for obstruction of justice). The Court agrees that trial counsel's performance was deficient in some respects, but

AO 72A
(Rev.8/8
2)

disagrees that defendant has shown the necessary prejudice.

I.   **PROCEDURAL HISTORY**

On September 26, 2006, defendant Adam Denney was indicted, along with Jeffrey Shore and Charles Tuttle, for bank fraud.  Defendant was charged with a conspiracy to commit bank fraud and loan application fraud and with two substantive counts of the same.  ([1].)[1]  Defendant was arraigned the day after the indictment and directed either to obtain counsel of his own choosing or to request appointment of counsel.  ([7].)  On October 3, 2006, Mr. Joseph Siciliano entered an appearance as defendant's retained counsel.   ([14].)   Neither defendant nor his two co-defendants filed any pretrial motions, and the case was certified as being ready for trial as to all defendants in late December 2006.  ([43, 44, 49].)

Defendant Tuttle entered a plea of guilty on April 3, 2007 and, at that same time, the Court set the trial date for the remaining two defendants for May 14, 2007.  ([60, 62].)  Counsel for defendant Denney requested a continuance until June, due to scheduling conflicts, which was granted.  In the meantime, defendant Shore entered a plea of guilty in May, and the trial for defendant Denney was reset for July 30.  ([64, 69, 75].)

In the Order setting a trial date, the Court also set a date for

---

[1]   Unless otherwise noted, all citations to the record in this Order refer to case number 1:06-cr-406-JEC.

AO 72A
(Rev.8/8
2)

a pretrial conference, as well as internal deadlines for counsel to file joint voir dire, requests to charge, and any motions in limine. ([75].) Counsel for defendant Denney, Mr. Siciliano, did not comply with these internal deadlines, however. In her own submission of proposed voir dire, the prosecutor noted her awareness that the submission was directed to be a joint pleading, but stated that "after sending defense counsel proposed voir dire questions on several occasions and asking for input, none has been received." ([80] at 1, n.1.) Nor had defense counsel submitted any requests to charge. This inaction prompted the Court to issue an Order on July 20 indicating that given the lack of response from defendant, the Court would proceed to use only the Government's proposed voir dire and requests to charge. ([81].) Thereafter, defense counsel did submit requests to charge. ([86].)

Approximately, a week before the July 30 trial date, the Government filed a motion in limine, noting that Mr. Siciliano had sent an email indicating that the defendant intended to put up an alibi defense. The prosecutor indicated that she had requested notice of an alibi defense and a request for reciprocal discovery almost ten months before, when the Government had provided discovery to the defendant, but neither had been provided. She asked the Court to preclude the use of an alibi defense by the defendant.

Before the pretrial conference on July 27, defense counsel had

3

provided the Court with a response, indicating that the Government's earlier request for notice of an alibi defense had not complied with the applicable requirements for such a request.[2]  The Court agreed with defense counsel that, as a technical matter, the Government's request was not in total compliance with the applicable rule, and permitted defendant's belated notification of an alibi defense.  The Court, however, required defense counsel to provide counsel for the Government with a precise chronology of the alibi defense by the end of that business day.  ([185] at 50-55.)  To allow preparation by the Government, the Court continued the trial for one day, until Tuesday, July 31.

Trial began on Tuesday, July 31.  Defense counsel, appearing prepared as to the anticipated testimony of Government witnesses, did a competent job in his cross-examination of those witnesses and in his closing argument and was successful in obtaining the acquittal of his client on one count of the three-count indictment.[3]  That is, as will be discussed below, the alibi defense met with partial success.  As to the date corresponding to the conduct described in Count 2, the alibi defense succeeded, and defendant was acquitted.  As to the date

---

[2]  This response was apparently never filed, but was referenced in the colloquy between the parties at the pretrial conference.  (*See* Tr. of July 27, 2007 Pretrial Conference [185] at 38-48.)

[3]  Counsel, however, was habitually tardy, arriving late for court on three of the four trial days.

4

AO 72A
(Rev.8/8
2)

corresponding to Count 3, however, the Government succeeded in showing that defendant's explanation of his whereabouts on that day was false.  And as the Government had abundant other evidence corroborating defendant's participation in the events of that day, defendant was convicted on Count 3.[4]

Following his conviction on two counts of the indictment, defendant met with the probation officer to go over his potential Sentencing Guidelines' exposure.  According to defendant, it was at this meeting, that he first learned, to his great alarm, of the likely sentencing range to which he was exposed.  Shortly thereafter, he retained new counsel, Mr. Steven Sadow (who will sometimes be referred to as sentencing counsel).  The presentence report calculated the defendant's advisory guidelines range as Offense Level 25/Criminal History Category I, calling for an advisory range of 57-71 months.  Mr. Sadow objected to the 2-level enhancement for loss, as overstating the loss attributable to defendant; the 2-level enhancement for sophisticated means; and the failure to give defendant a 2-level mitigating role reduction.[5]  Significantly, in contrast to defendant's combative position at trial, in which he,

_____

[4]   Count 1 was a conspiracy count that spanned many months and for which no alibi was offered, defendant was also convicted on that count.

[5]   Counsel had initially objected to the 2-level enhancement for obstruction of justice, but at sentencing withdrew that objection.

directly, and through counsel denied any culpability in the charged-criminal acts, at sentencing, defendant acknowledged the falsity of his alibi as to Count 3, his guilt on that count, and his contrition.

Mr. Sadow succeeded in all his objections to the guidelines' adjustments, and the Court revised defendant's final guidelines' calculation to an Offense Level 19/Criminal History Category I, calling for an advisory range of 30-37 months imprisonment. Counsel requested that the Court vary below that range and impose a 24-month sentence, but the latter declined to do so, imposing a low end-of-the-range sentence of 30 months.[6]

Thereafter, defendant reported to his designated institution to begin his sentence. After having served approximately eight months of that sentence, defendant file a *pro se* § 2255 motion. (Movant's Mot. to Vacate [179].) In that motion, he asserted that his trial counsel had rendered ineffective assistance of counsel in that he had failed to properly prepare defendant and his wife for their "alibi" testimony, had failed to properly prepare generally for trial, and had failed to ask for a continuance when he was ill during the trial. Defendant also asserted that his sentencing counsel was ineffective for not having adequately discussed the advantages and disadvantages

_____

[6]   Co-defendant Shore, the leader of this conspiracy, received a 60-month sentence and co-defendant Tuttle, who had cooperated with the Government and received a § 5K1.1 motion for substantial assistance, received a 36-month sentence.

6

AO 72A
(Rev.8/8
2)

of an appeal.

Following briefing and the filing of affidavits by Mr. Siciliano and Mr. Sadow, the Court issued an Order denying defendant's claim as to sentencing counsel, Mr. Sadow. As the Court noted, among other things, "Mr. Sadow's performance was not only <u>not</u> ineffective, but it was highly effective with the Court." (Order [202] at 10.) As to allegations concerning trial counsel, Mr. Siciliano, however, the Court determined that an evidentiary hearing should be held. (*Id.* at 12-13.) In addition, although defendant had not requested a bond pending resolution of his § 2255 motion, the Court noted that he had served about half of his 30-month sentence. Concerned that he might serve his entire sentence before this motion could be resolved, the Court *sua sponte* offered him an opportunity to be considered for release on bond and directed that he appear before a magistrate judge to indicate his wishes. (*Id.* at 12-16.) The Court also invited defendant to apply for appointment of counsel for the upcoming hearing, assuming that he could meet the financial standards for this appointment. (*Id.* at 16.)

Shortly thereafter, defendant appeared before the magistrate judge, who released the defendant on bond and appointed him counsel: Mr. John Lovell (who will sometimes be referred to as habeas counsel). Four claims concerning Mr. Siciliano's performance were then pending. Prior to the evidentiary hearing on Defendant's four

7

remaining claims, defendant abandoned three of those claims and
informed the Court that he was proceeding on only the remaining
claim. (Def.'s Prehearing Mem. [229].) In other words, defendant
elected not to proceed on any claim concerning Siciliano's alleged
inadequacies to the extent that the latter might impact the validity
of the conviction.[7]

Rather, defendant elected to proceed on the one claim asserting
that Siciliano had failed to convey a plea offer to Defendant before
trial and had failed to properly advise Defendant of the option of
pleading guilty. (*Id.*; Def.'s Mot. to Vacate [179] at 14-20, 26-29.)
In short, defendant is not attacking his conviction, but is instead
attacking the length of the sentence imposed, arguing that
Siciliano's ineffectiveness resulted in a more severe sentence than
defendant would have received had Siciliano performed adequately.

An evidentiary hearing was ultimately held on this matter. At
that hearing, the defendant, his wife, and Mr. Siciliano testified.
In addition, affidavits of other witnesses were also filed. The
defendant has filed a pre-hearing brief, as well as three briefs
since the conclusion of the evidentiary hearing ([236, 237, 238]);

---

[7]   Habeas counsel, Mr. Lovell, indicated his uncertainty that
defendant could prove prejudice as to any of those claims. The Court
agrees with that assessment.

AO 72A
(Rev.8/8
2)

the Government has also filed a post-hearing brief [233].[8]

## II.   <u>LEGAL CLAIMS AND APPLICABLE LEGAL STANDARD</u>

In his post-hearing briefing, defendant points to several deficiencies in his trial counsel's preparation and diligence.  At bottom, however, the claim of ineffective assistance boils down to two allegations of ineffectiveness for which defendant asserts that he suffered prejudice.  First, defendant concedes that he cannot argue that his trial counsel failed to convey a plea offer tendered by the Government, because, in fact, the Government never offered him a plea agreement.  Nevertheless, defendant argues that he would have been exposed to a lower Sentencing Guidelines' range had he pled guilty, "straight-up," without a plea offer.  That is, had he pled guilty, he would have been eligible for a two to three-level reduction[9] for acceptance of responsibility that was not given to him because he went to trial and proclaimed, not his acceptance of responsibility, but his renunciation of any responsibility. Defendant alleges, accurately, that his attorney never informed him

---

[8]  The Government actually filed two briefs [232, 233] close in time to each other. The Court's review suggests that they essentially cover the same ground, but the later brief is the operative version.

[9]  Under the Guidelines, a defendant may receive a two-level reduction of acceptance of responsibility without a recommendation by the Government.  To receive the third point, the Government must make the recommendation, based on the defendant's timely notification of his intention to plead guilty.  *See* U.S.S.G. § 3E1.1.

AO 72A
(Rev.8/8
2)

that there could be a benefit, in terms of the length of his guidelines' calculation and ultimate sentence, had he pled guilty instead of going to trial.

Second, and somewhat similar to his first claim, defendant also faults his attorney for not better advising him that his alibi defense could founder, at least in part. Specifically, when the Government showed that he and his wife's alibi for the date set out in Count 3 was not plausible, defendant was exposed to a two-level increase in his guidelines' calculation based on obstruction of justice: an enhancement that is available when a defendant has lied about a material matter to a jury in an effort to convince the latter of his innocence.[10]   *See* U.S.S.G. § 3C1.1.   At sentencing, this Court imposed that two-level enhancement.   In short, because he went to trial and not only accepted no responsibility for criminal conduct, but also lied to the jury in an effort to persuade them of his innocence, the defendant effectively received a four to five-level

---

[10]   Being caught in an untruth could have also prejudiced the jury in its determination of the defendant's guilt.  Here, however, defendant wisely does not argue that the melt-down of part of his alibi defense affected the jury's verdict.  Indeed, the latter acquitted the defendant as to the count on which his alibi defense was not impeached: Count 2.  Moreover, as to the count on which defendant was convicted (Count 3), and on which his alibi defense was disproved, the Government had ample other evidence to convict the defendant of this count.  The Court concludes that the jury would have convicted the defendant on this count even had he not taken the stand and lied about his whereabouts on the specified date.

increase in his sentencing guidelines' calculation that would not have occurred had he pled guilty and not lied in a court proceeding.

To prevail on a § 2255 motion, the defendant must demonstrate that: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the Court was without jurisdiction to impose such a sentence; (3) the sentence exceeded the maximum sentence authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255. A sentence is subject to collateral attack when there is a fundamental defect that results in a complete miscarriage of justice. *United States v. Addonizio*, 442 U.S. 178, 185 (1979). "To obtain collateral relief a [defendant] must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982).

A sentence imposed based on a trial at which the defendant received ineffective assistance of counsel would, of course, violate the Constitution. To establish ineffective assistance of counsel, a § 2255 defendant must show (1) that his counsel's performance was so deficient that it fell below objectively reasonable standards, and (2) that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984). Under the first prong of the test, a court should be "highly deferential" in scrutinizing counsel's performance, *id.* at 689, and "must indulge [the] strong presumption that counsel's performance was reasonable

11

and that counsel made all significant decisions in the exercise of reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000)(internal quotation marks omitted). To establish deficient performance, a defendant must establish that no objectively competent lawyer would have taken the action that his lawyer took. *Id.* at 1315.

Under the second prong of the test, a defendant must show that his counsel's challenged acts or omissions prejudiced him; i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A court need not address both *Strickland* prongs if the defendant "makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

The Supreme Court has focused fairly recently on the availability of an ineffective assistance claim when a defense attorney has offered advice that has prompted his criminal defendant client to reject a plea offer and go to trial. In *Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376 (2012), the Supreme Court recognized that a defense attorney can subject himself to an ineffective assistance of counsel claim in the above scenario. Because the State agreed that defense counsel had performed deficiently in advising the

12

defendant to reject the plea offer,[11] the Court saw no need to offer specific guidance as to when such advice might typically be deemed deficient.  Rather, it indicated that the standard should mimic the performance standard set out in *Strickland v. Washington,* 466 U.S. 668 (1984): whether counsel's representation fell below an objective standard of reasonableness.  *Lafler*, 132 S. Ct. at 1384.

As to the second prong of the *Strickland* test--the prejudice prong--the Court likewise invoked the general *Strickland* test on that prong: that but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.*  But it also articulated a more specific test for situations in which "ineffective advice led not to an offer's acceptance, but to its rejection."  *Id.* at 1385.  To demonstrate prejudice in that scenario:

> a defendant must show that but for the ineffective advice of counsel <u>there is a reasonable probability that the plea offer would have been presented to the court</u> (*i.e.,* that

---

[11]   Defendant Lafler had fired a gun repeatedly at his victim, shooting her in the buttocks, hip, and abdomen.  This conduct had given rise to various charges, including assault with intent to murder and possession of a firearm by a felon, among others.  The State had offered to drop some of the charges and recommend a 51-85 month sentence in exchange for a guilty plea.  Defense counsel recommended that his client not accept the deal, under the mistaken belief that the State would be unable to prove an intent to murder, given the fact that the victim had only been shot below the waist. Not too surprisingly, the attorney's cramped interpretation of the law turned out to be wrong.  By the time the defendant found this out, however, he had gone to trial, been convicted, and then later received a mandatory-minimum sentence of 185-360 months.  *Lafler*, 132 S. Ct. at 1383.

AO 72A
(Rev.8/8
2)

> <u>the defendant would have accepted the plea</u> and the
> prosecution would not have withdrawn it in light of
> intervening circumstances), that the court would have
> accepted its terms, and that the ... sentence ... under the
> offer's terms would have been less severe than under the
> judgment and sentence that in fact were imposed.

*Id.* (emphasis added). *See also Coulter v. Herring*, 60 F.3d 1499,

1504 & n.7 (11th Cir. 1995)(when a defendant contends that he would

have pled guilty had he received proper advice from his counsel, he

"'must show that there is a reasonable probability that, but for

counsel's errors, he would . . . have pleaded guilty and would [not]

have insisted on going to trial.'" (quoting *Hill v. Lockhart*, 474

U.S. 52, 59 (1985)).

**III. <u>TRIAL COUNSEL'S FAILURE TO ADVISE THE DEFENDANT THAT HIS SENTENCING GUIDELINES MIGHT BE LOWER, WERE HE TO PLEAD GUILTY AND RECEIVE A REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY</u>**

**A.   <u>Background</u>**

To place in context the present dispute, it is necessary to

understand defendant's conduct in the underlying facts that led to

the indictment and conviction of him and his two cohorts.  As to any

facts pertaining to the counts on which the defendant was convicted,

the Court takes the facts in the taken in the light most favorable to

the Government.  In the course of refinancing his home, defendant met

co-defendant Tuttle, who was employed by a mortgage broker.

Defendant, himself, owned rental property and operated his own real

AO 72A
(Rev.8/8
2)

estate investment company.[12]   Tuttle introduced defendant to co-defendant Shore, a practiced con artist.   The latter represented himself as the manager of a very lucrative hedge fund and offered to repay the defendant $20,000 in a few weeks for a $15,000 loan/ investment.   Shore came through with the first repayment.   Defendant ultimately invested more money, however, and Shore, offering many excuses, did not repay all of that money.   There was, of course, no hedge fund, as one could reasonably infer the defendant to have soon deduced.   Eventually, defendant had invested about $80,000, with the promise of receiving over $170,000.

Eager to get back his money and perhaps any anticipated "profit" Shore might dole out, defendant decided to employ some self-help by assisting Tuttle and Shore in their dishonest dealings with other potential shills.   The Court infers that defendant was aware that the only way he was going to get back any money from Shore was to find new "investors" who could infuse cash into Shore's operation.   So, defendant turned to his life-long, childhood friend, Romano Baldelli, and enticed the latter to invest $100,000 in Shore's "can't miss" hedge fund.   Of course, as with all Shore's investors, Mr. Baldelli found the investment part a lot easier than the return part of the

---

[12]   At the § 2255 evidentiary hearing, the defendant testified that he had operated several multi-million dollar businesses. (§ 2255 Evid. Hr'g [231] at 76.)

transaction, and he became insistent that his friend, Adam Denney, make good on this transaction that he had vouched for.

Eventually, Shore made an effort to have the owner of two luxury condominiums, on which he was currently poaching, sign over those properties to him, so that he could obtain an equity loan. There was a meeting between Shore, Tuttle, Denney, and the owner, with Denney playing the role of "good cop" to Shore's "bad cop." (Trial Tr. [140] at 46.) The owner, a naive college professor, had been gullible up to this point in Shore's assurances that he was going to purchase the property, but didn't bite at this proposal.

His refusal, however, did not stop the three defendants in their effort to obtain title to the professor's properties in order to obtain a large equity loan against the properties. Defendant Denney had some experience with quitclaim deeds and the defendants decided to have someone pose as the professor, Mr. Bagwell, and endorse a quitclaim deed to each of the two properties to co-defendant Shore. As to the first such effort, defendant Denney was not the person posing as Bagwell, as he was with his wife in Myrtle Beach and had an alibi for the day in question. The Government contended that he was still responsible for his role in planning the forgery, but, as noted, the jury acquitted on that count.

As to the second effort, the defendant Denney did pose as Bagwell, going to a Pak Mail store with fake identification,

endorsing Bagwell's name on the fake quitclaim deed to Shore, and having that signature notarized by an employee of the store. In support of defendant's indictment on this count, the Government produced the employee who had notarized the defendant's signature, and he identified Denney from a photographic spread and at trial. The Government also introduced an audio tape of the meeting between the condominium owner and the three defendants. In addition, the defendant, who was getting more and more pressure from his friend, Mr. Baldelli, indicated to the latter that money should be forthcoming, as defendant admitted to Baldelli that he had posed as someone else in an effort to get money back from that person's property. Baldelli so testified at trial. Finally, co-defendant Tuttle, now a cooperator with the Government, confirmed defendant's knowing involvement in the conspiracy, as set out above. Although the defendant and his wife also attempted an alibi defense on the count concerning the forged quitclaim deed notarized at the Pak Mail store, that effort failed. The jury convicted on this count, as well as on the conspiracy count.

**B.   Factual Findings As to Defendant's Allegations**

As noted, the Government never made a plea offer to defendant. For that reason, defendant cannot argue that trial counsel failed to communicate an offer that was never made. Instead, defendant argues that Siciliano failed to convey to him that he had an option to plead

17

guilty without a plea offer, and that this failure was the equivalent of failing to communicate a plea offer. In assessing the factual basis of this claim, and the claim regarding the botched alibi defense, the testimony of defendant and Siciliano is not always clear-cut, and there are numerous gaps as to the substance and amount of their interaction with each other from the time when defendant retained Siciliano until the conclusion of defendant's jury trial. Indeed, on certain points, each man's testimony seems more conclusory than an actual recollection of what happened or what was said. And while there are some disputes between the defendant and Siciliano, there are some areas in which there seems to be agreement.

To determine as accurately as possible the advice given and the extent to which the defendant likely relied on that advice, the undersigned has reviewed again the trial transcript, the transcript of the pretrial conference between the Court and counsel, the transcript of the sentencing hearing, and the transcript of the § 2255 evidentiary hearing: at all of which proceedings the undersigned presided. Instead of attempting to cite to each man's testimony on every particular point, which, given the nature of the testimony, would be quite tedious, any factual conclusions stated by the Court, from hereonafter, represent its findings as to the pertinent facts in the case. Where the Court makes a finding that may be contrary to what either or both of the men may have testified,

18

it means that the Court has found not credible the particular testimony on that point.

    1.   <u>Contacts and Communications Between Defendant and Siciliano Prior to Trial</u>

Following his arraignment, defendant retained Mr. Siciliano to represent him in his criminal case.[13]  The Court does not know how defendant knew Siciliano[14] or why he would choose to pay almost $20,000 to someone whom, as far as the Court can determine, had little to no prior federal criminal experience.[15]  But retain him, he

---

[13]  There is some dispute about how much defendant paid Siciliano.  The latter says that the retainer agreement required a payment of $25,000 and that defendant paid him only $17,000. Defendant says that he paid Siciliano $20,000.  This dispute is immaterial to the pertinent issues before the Court.

[14]  The undersigned has some recollection of being told that defendant and Siciliano knew each other socially, but has had difficulty finding that statement in the above transcripts.

[15]  At the evidentiary hearing, in response to habeas counsel's inquiry about his prior federal criminal experience, Siciliano was vague.  He indicated that he might have worked on three federal criminal drug cases when he had been an associate in a small firm, but could not provide any clients' names or other information about the cases.  Further, he thought that maybe one of those had gone to trial, but could offer no further detail.  (§ 2255 Evid. Hr'g [231] at 127.)  An inquiry on the Court's cm/ecf system indicates that Mr. Siciliano has appeared in eight civil cases in this district, from the years 1998-2006, but no criminal cases.  The Court concludes that Siciliano had no significant federal criminal experience before this case.  But it will assume that the latter told the defendant that he did have federal criminal experience.

19

did.[16]

Defendant first met with Siciliano to discuss the case in October, approximately one week after he was arraigned. (§ 2255 Evid. Hr'g [231] at 45.) According to defendant, Siciliano told defendant that out of approximately 1,000 pages of discovery material Siciliano had received from the Government, only three or four pages implicated defendant. Defendant looked through the discovery that Siciliano then had. He saw the photographic lineup that included him and got a copy of the audio tape of conversations between defendant, Shore, Tuttle, and the owner of the condominiums in Buckhead for which quitclaim deeds were forged. Siciliano indicated that he would not do much in the way of trial preparation until 30 days before trial. (*Id.* at 44-47.)

In December 2006, defendant met again with Siciliano. According to defendant, the latter indicated that the prosecutor refused to make a plea offer, as she said that she had plenty of evidence against the defendant. Again, Siciliano purportedly indicated that he didn't know why she was so adamant, as the defendant was referenced in only a few pages of discovery. Siciliano opined that the defendant was looking at little to no jail time if convicted and

---

[16] At the initial appearance, the magistrate judge had told the defendant that if was unable to retain an attorney, he should appear again for the magistrate judge to determine whether counsel should be appointed for him. ([7].)

20

expressed optimism about an acquittal. From these remarks, defendant interpreted going to trial as a no-lose proposition, as he wouldn't be looking at much jail time whether convicted via a plea of guilty or a trial. (*Id.* at 47-49.) Defendant also admits that he professed his innocence of the offense to his attorney. (*Id.* at 57, 97-98.)

The defendant testified that after this December meeting, he spoke with Siciliano at least once a month, with most calls being initiated by the defendant. Siciliano continued to indicate that he would not be doing much preparation until thirty days before trial. (*Id.* at 72.) He learned through his attorney that co-defendant Tuttle had a plea in place and later that Tuttle had, in fact, pled guilty (in April); Siciliano testified that he learned through the defendant of the plea. (*Id.* at 120.) The defendant was aware that Tuttle was "maybe" cooperating, but says he never discussed this with his attorney. (§ 2255 Evid. Hr'g [231] at 72, 74.) Notwithstanding his knowledge of Tuttle's plea, defendant did not initiate a discussion with his attorney about pleading guilty, because he had hired the latter to make those kind of decisions for him. (*Id.* at 74-76.)

At some point, defendant may have read Tuttle's "statement." He also learned that co-defendant Shore had pled guilty (in May). He was, of course, aware that he and Shore had had many conversations and meetings concerning matters underlying the allegations in the

21

indictment, but defendant was not worried about what Shore might say in testimony against defendant. (*Id.* at 80.)  Through all these events, Siciliano never brought up the idea of defendant pleading guilty, and defendant likewise did not initiate the topic.  Further, defendant testified that Siciliano continued to indicate his belief that the defendant faced little to no time, and maybe even probation or home confinement, as the defendant was a bit player in the scheme. He professed this faith in his attorney's prognostication, notwithstanding his own awareness that he was guilty of forging a quitclaim deed and that he had been involved in fraud concerning high-end property worth approximately one and one-half million dollars. (*Id.* at 78-85.)

Within the two-week period before trial, defendant intensified his efforts to talk to Siciliano by emailing the latter, who rarely responded. The two did discuss who might testify at trial, but otherwise the defendant cannot remember much of what was said in the emails or conversations. (*Id.* at 94-98.)  Throughout his relationship with Siciliano, he had told the latter that he was innocent and never altered that statement. (§ 2255 Evid. Hr'g [231] at 97.)

For his part, Siciliano testified that he and the defendant talked several times a week throughout the case, that they talked about potential defenses, and that defendant was always adamant that

he was innocent.  (*Id.* at 116-118.)  During these conversations, the two men discussed the civil trial in which Baldelli had sued the defendant for the events that led to the loss of Baldelli's money. They also discussed the pleas of Denney's co-defendants, and Denney knew about those developments before Siciliano did.  They further talked about the eye-witness to the forgery, but Siciliano told the defendant that he felt good about his ability to impeach that eyewitness with the latter's prior felonies.  Further, they discussed the fact that the owner of the Pak Mail establishment, and the mother of the eye-witness, had been present on the date of the forgery and could not identify the defendant as the forger.  (*Id.* at 119-21.)

As to Siciliano's assessment of the strength of the Government's case, he testified as to the following:  that he told the defendant that there was a high conviction rate--over 90%--in federal court and that the audio tape recording of the meeting involving the defendant was a problem.  He claims that he never said that the Government had a weak case, because he thought they had a good case.  Given the prosecutor's intransigence on offering a plea deal, Siciliano purportedly mentioned the idea of the defendant pleading "straight-up and throwing himself on the mercy of the Court; he said that a guilty plea would involve "some" jail time.  The defendant, however, was adamant that he was innocent and that he would not do any time.  (*Id.* at 120-122.)

23

As to whether he ever went over the potential guidelines calculations with the defendant, positing either a trial or a guilty plea, Siciliano acknowledged that he did not do so, but claimed that this was because his client insisted he was innocent.[17] (*Id.* at 120.) In cross-examining Siciliano, however, habeas counsel was quite effective in demonstrating that Siciliano had little familiarity or experience with federal criminal procedures or the federal Sentencing Guidelines while representing the defendant.

Although Mr. Siciliano indicated that he was familiar with the Sentencing Guidelines before representing the defendant, his testimony was not persuasive on this point.  He indicated that he knew generally about the Guidelines from law school and knew enough when he first met with the defendant to tell the latter that he would have do to some jail time on the charge.  Yet, he unpersuasively asserted that he knew this without even looking at the Guidelines, which he apparently never did throughout the representation.  He further claimed that he never performed a Guidelines' analysis after receiving discovery, because he knew that the defendant would have to do some time and he so informed the defendant, who was adamant that

---

[17]   As for his own curiosity about or awareness of the Guidelines, pre-trial, defendant testified that he was aware of them and tried to figure them out, but just couldn't comprehend them, and, as far as he knew, Siciliano never looked at the Guidelines. (*Id.* at 89.)

24

AO 72A
(Rev.8/8
2)

he was innocent and that, if he was going to do time anyway, he might as well just go to trial. (*Id.* at 127-35, 169-72.)

2.   Defendant and His Wife's Alibi Testimony

Both the defendant and his wife took the stand to testify that the defendant had an alibi for both dates on which the two quitclaim deeds for Bagwell's condominiums were forged: July 27 and August 11, 2004.  This was a problem, however, as defendant had not responded to the Government's request for notice of alibi right after arraignment when the latter was sent.  As discussed above, the prosecutor filed a motion to bar use of an alibi defense.

As summarized above, in a pretrial conference the Friday before a Monday trial date, the Court ruled that defendant could use an alibi defense, but required defense counsel to provide the specifics of that defense by the end of the day so that the prosecutor could investigate over the weekend.  The Court did delay the start date for the trial until Tuesday.

Defense counsel communicated with defendant Denney who emailed his attorney the specifics of his and his wife's alibi defense.  The alibi defense for the July transaction--that the defendant and his wife were in Myrtle Beach--was not contested by the prosecutor, and the jury later acquitted the defendant on that count.  The alibi for the August 11 transaction was another story.  As noted, defendant and his wife claimed that, having missed their anniversary the week

25

before when the defendant was out of town, they made up the missed celebration by spending almost the entire day of Wednesday, August 11, at an outlet mall, where the wife, together with her husband, made purchases at the Burlington Coat Factory and Bath and Body Works.  At lunch time, the two enjoyed a $20 anniversary lunch at a restaurant called Sweet Tomatoes.

As the Court jokingly, but it turned out prophetically, told defense counsel at the pretrial conference, few women on the jury were going to believe that the above encounter would make up for a missed anniversary, nor would many wives believe that they could manage to drag their husbands on such an excursion.  But this was a defense that the defendant, himself, seemed determined to pursue.  In the chronology sent by the defendant via email to his attorney to give to the prosecutor, he indicated that he and his wife had eaten at a restaurant called Uncle Vito's.  By the time of trial though, the defendant and his wife, who were relying on a bank credit card statement to corroborate their story, saw that there two restaurants listed for August 11 and realized that the August 11 date for Uncle Vito's must have been the posting date, not the transaction date for that restaurant visit, and that instead it was a restaurant called Sweet Tomatoes that was visited on August 11.  Mrs. Denney made the change of the restaurant name in her testimony.

Oddly, the couple did not reach the same realization as to the

purchases made at Bath and Body or at Burlington Coat Factory, which also predated August 11, although the latter was likewise the posting date, not the transaction date, for these purchases.  Or if they realized it, they decided that it was more important to stick to their very detailed story of a romantic day spent at the outlet mall. Otherwise, they were left with only a lunch at Sweet Tomatoes on August 11, giving Mr. Denny plenty of time to go to the Pak Mail store and forge his quitclaim deed, which of course he did.[18]

The Government spectacularly impeached this alibi story, and the jury convicted defendant of the forgery count on August 11.  As noted above, the Government already had abundant evidence to place the defendant at the scene of the forgery.

       3.    <u>The Parting of the Ways Between Defendant and His Trial Counsel</u>

Shortly after his conviction, the defendant and Mr. Siciliano met with the probation officer who was preparing the presentence report.  During that meeting, Siciliano asked the officer "vague questions" about how things work and expressed an unfamiliarity with the Guidelines.  Later on, about ten days before the sentencing hearing was originally set, the defendant received by e-mail (presumably from Siciliano) a copy of his presentence report, showing

---

[18]   And it is apparent now that defendant was not present with his wife at Sweet Tomatoes on August 11 either.

AO 72A
(Rev.8/8
2)

that his Guidelines range was 57-71 months imprisonment.  Defendant was shocked, and at that time, he and wife decided "to hire additional counsel...to see...if there's anything we could do about that."  (*Id.* at 61-63.)  Thereafter, defendant retained his sentencing counsel, Steven Sadow, to handle that proceeding.

## IV.   **ANALYSIS OF INEFFECTIVE ASSISTANCE CLAIM REGARDING DEFENDANT'S PERJURIOUS TESTIMONY AT TRIAL**

As noted, one of defendant's claims focuses on his trial counsel's alleged ineffectiveness with regard to the defendant's false testimony at trial.  As set out above, defendant and his wife testified that defendant could not have been the person who forged the quitclaim deed on August 11, because the defendant and his wife were together that entire day shopping at an outlet mall and eating lunch.  In support of that alibi, defendant presented a credit card bill showing charges for the purchases and restaurant bill about which he and his wife had testified.  Also, as noted above, the prosecutor shot holes through this story, introducing a bank witness who testified that the dates on bill for the purchases were posting dates, not purchases dates, and the items were purchased on an earlier date.[19]

---

[19]   As to the July forgery, however, defendant and his wife introduced telephone bills that corroborated their account that defendant was in Myrtle Beach on that day.  The Government did not impeach this part of the alibi.

In essence, defendant argues that his attorney performed ineffectively because the latter did not realize that the dates on the bill were not the transaction dates and did not anticipate the impeachment that would follow. As to this claim, the Court concludes that defendant has failed to prove either prong of the *Strickland* standard: either performance or prejudice.

As to the performance prong, defendant must prove that his trial counsel's performance fell below an objective standard of reasonableness. Under the particular circumstances here, the Court finds that it did not, or rather that any fault here lies mostly at the feet of the defendant. That is, it is clear to the Court that this alibi idea was all the defendant's and that he was intent on placing it before the jury. It took some initiative to come up with this strategy, and initiative was not a trait strongly displayed by Mr. Siciliano. Moreover, at the pretrial conference, Siciliano did not appear particularly enthusiastic about presenting the defense, noting that he would not put the defendant on the stand to testify about an alibi, absent some corroborating documents. ([185] at 45.)

The Court also finds that the alibi idea was a late-breaking plan hatched by the defendant. Given the lateness of defendant's disclosure of a notice of alibi, the Court directed Siciliano to get an exact timeline for the alibi to the prosecutor by close of business on the day of the pretrial conference. What defense counsel

29

sent the prosecutor was dictated by the defendant, as evidenced by his email back to Siciliano.  Indeed, defendant's commitment to the alibi strategy was evidenced by the fact that he scolded his wife after her testimony for messing the dates up: a point that Siciliano mentioned in his affidavit and which the Court believes to have occurred.  (Aff. of Siciliano [196] at 9, at § 27.)

Defendant has argued, in effect, that his attorney should have dissuaded the defendant from putting up the defense as to the August 11 date.  That is, he says trial counsel should have pointed out that the dates on the bank bill could have been posting dates and not transaction dates.  But, as explained above, the defendant and his wife obviously figured that out, themselves, as Mrs. Denney changed their testimony on the stand as to the restaurant visited versus the restaurant listed on the alibi notice to the Government.  Later, in his closing argument, defense counsel fell on his sword, telling the jury that he had made the mistake in communicating the notice, but, in truth, the inconsistency was all defendant's doing.  Likely, defense counsel could have been more forceful in trying to discourage this alibi defense, but the Court is leery of suggesting that an attorney should try to browbeat a client against testifying when the latter is intent on doing so and repeatedly assures his attorney that his testimony is truthful.

Nevertheless, even assuming that trial counsel's performance as

30

to this matter was not objectively reasonable, defendant has still failed to demonstrate prejudice. As noted, the jury obviously did not hold defendant's perjury against him, as the jury accepted the part of his alibi defense pertaining to the July forgery and acquitted him on that account. And, as to the August forgery, defendant was going down on that count anyway, whether or not he testified, as the Government had abundant evidence to convict him for that conduct.

As to any argument by defendant that he was prejudiced because his attorney did not tell him that he might receive a harsher sentence if he lied at trial, it is true that trial counsel never advised the defendant that the Sentencing Guidelines provide for an enhancement for perjury at trial. Yet, while, as a general matter, the Court does not expect a defendant to be aware of the intricacies of the guidelines or how particular enhancements may be triggered, the Court does not find credible defendant's excuse that he was unaware that lying could result in a tougher sentence for him down the road. By the third grade, most of us understand that if we lie to our parents or teacher, things will go rougher when punishment is meted out. The Court therefore finds disingenuous defendant's protestation that he was later shocked to learn that his false

AO 72A
(Rev.8/8
2)

testimony could result in a harsher sentence.[20]   Accordingly, the Court concludes that defendant was aware that lying could hurt him down the road at sentencing, should he be convicted, but chose to roll the dice on that possibility.  His trial counsel's failure to specifically advise him of that risk therefore did not prejudice him.

**V.   ANALYSIS OF INEFFECTIVE ASSISTANCE CLAIM REGARDING TRIAL COUNSEL'S FAILURE TO INFORM DEFENDANT THAT HE WOULD LIKELY RECEIVE A LESSER SENTENCE SHOULD HE PLEAD GUILTY THAN IF HE WENT TO TRIAL AND WERE CONVICTED**

   **A.   Performance Prong**

Defendant's stronger argument is that his trial counsel provided ineffective assistance when he failed to explain to defendant that he would likely receive a lower sentence if he pled guilty, versus going to trial and then being convicted.  On this claim, the Court does find counsel's performance lacking.  Having been present at all the pertinent proceedings and having reread the transcripts, the Court concludes that trial counsel was operating under a misimpression that, absent a plea agreement with the Government, it would make no sense for a defendant to enter a plea of guilty.  That is, without a plea agreement, the defendant would likely get about the same sentence if he pleaded guilty as if he went to trial.  Indeed, trial

---

   [20]   Defendant claims that because he was not on trial for perjury, he was justified in his belief that his sentence would not be enhanced for his lying on the stand.  (§ 2255 Evid. Hrg. [231] at 86.)

AO 72A
(Rev.8/8
2)

counsel seemed fixated on the fact that the prosecutor would not give him a plea offer. It was habeas counsel's theory that any criminal law experience Mr. Siciliano might have had would have been in the state court system, in which apparently pleas of guilty almost always occur in connection with a plea agreement.  And often the state trial court will impose a sentence consistent with that plea agreement.

Of course, it is perhaps not too surprising that trial counsel might initially default to his knowledge of state court proceedings, as he seems to have had little to no federal criminal experience and the Court is uncertain whether he had even heard of the federal Sentencing Guidelines when he accepted defendant's case. Unfortunately, trial counsel never left this default position, as he never tried to figure out how the federal sentencing system works.

In fairness to trial counsel, the Court suspects that defendant gave little indication that he would be remotely interested in a plea of guilty, absent a strong indication that a plea would gain him a substantial benefit.  Indeed, the Court concludes that the defendant always repeated to Siciliano his protestation of innocence and his desire to go to trial.  *See Oliver v. United States*, 292 Fed. App'x 886, 887-88 (11th Cir. 2008)(rejecting ineffective assistance claim where § 2255 defendant "maintained his innocence throughout trial and during his sentencing, which undermines his claim that he would have consented to a plea agreement"); *Lamons v. United States*, Nos. 4:03-

33

cr-046-1-RLV and 4:09-cv-180-RLV, 2011 WL 3875996, at *9 (N.D. Ga. Aug. 10, 2011) (finding no prejudice where "the [§ 2255] defendant's conduct throughout these proceedings shows that he did not want to plead guilty . . . [as he] took the stand in the first trial and denied any culpability"), *adopted by* 2011 WL 3875991 (N.D. Ga. Aug. 30, 2011). Nevertheless, a criminal defense attorney's failure to know and to convey to his client the fact that, under the Sentencing Guidelines, a plea of guilty may result in a lower sentence than if the defendant went to trial is a failing that, under the circumstances of this case, falls below objectively reasonable standards.

B. **Prejudice**

While trial counsel performed ineffectively in failing to convey to defendant that a plea of guilty could result in a somewhat more lenient sentence than would occur should the defendant be convicted after a trial, the Court concludes that defendant has failed to prove that this error caused him prejudice. The prejudice prong of the *Strickland* test requires that the defendant demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. So, the question is: would this defendant have pled guilty had Mr. Siciliano gone over with him the potential Guidelines' benefit that he might receive by so pleading. It is the defendant's burden to prove that he would

34

have done so, but he has not persuaded this Court of that fact.  That is, the Court does not believe that defendant would have pled guilty merely upon learning from Siciliano that he might receive an incrementally lesser sentence with a plea.  It reaches this conclusion for the following reasons.

1.   <u>Degree to Which the Defendant Actually Relied on Siciliano In Making His Trial Strategy Decisions</u>

The most puzzling question in these post-sentencing proceedings has been the extent to which the defendant was actually relying on his trial counsel's advice in making his decision to go to trial. Unfortunately, it is an enigma that this Court has yet to unravel.

To recap, defendant was charged in a federal indictment for his involvement in fraud and forgeries concerning high-end condominium properties that resulted in substantial losses to the victims of this fraud.  He knew he was guilty, at the least, of forging one of the quitclaim deeds used to fraudulently transfer one condominium's title from its rightful owner to co-defendant Shore.  Not only that, he knew that co-defendant Charles Tuttle was aware of defendant's conduct and he learned, within a few months after his indictment, that Tuttle was cooperating with the Government and would be pleading guilty.  A couple of months before trial, he learned that the only other remaining co-defendant, Jeffrey Shore, was also pleading guilty and also might cooperate.  Prior to trial, he read the statements of

AO 72A
(Rev.8/8
2)

these co-defendants.

In addition, soon after indictment, he had received a copy of the audio tape in which he and his co-defendants attempted to bilk the true owner of the condominiums out of his property. He was aware that there was an eyewitness who would purportedly identify him at trial as the forger of one of the quitclaim deeds. In addition, he was aware that he had lured his childhood friend into investing in co-defendant Shore's bogus hedge fund and knew that this friend would testify against him. There was little doubt on this point, as this former friend had filed a civil suit against the defendant and provided testimony in that litigation. Further, the defendant knew that he had admitted earlier to this friend that he had forged one of the fake deeds. Finally, he knew that people have been imprisoned for real estate fraud and he had been concerned enough to look at the federal sentencing guidelines before trial, although he couldn't really comprehend them well and he did not believe that his trial counsel had even looked at them.

Given the above knowledge, much of it obtained well before the trial, defendant claims that he nevertheless believed his retained trial counsel when the latter consistently opined that the Government really didn't have a very good case and that counsel felt optimistic about an acquittal. Given his awareness of the evidence that the Government had against him, such prognostication, unsupported by any

36

explanation, should seem odd to anyone, including the defendant. That fact, plus the casual way in which his attorney appeared to be approaching the case, should have raised in defendant some scepticism as to how blindly he should hew to his attorney's vague and optimistic predictions.

That is, according to the defendant, it was generally him, and not defense counsel, who took the initiative to discuss how the case was progressing. All such conversations were purportedly brief and cursory, with defense counsel, in a hurried fashion, telling the defendant not to worry, things would be ok. There were few face-to-face meetings between the two men. Moreover, defense counsel was often unresponsive to defendant's inquiries and emails. Indeed, early on the defendant had sent a package to his attorney's address, only to have the latter returned undelivered. It was at this time that the defendant learned that his attorney no longer had office space, and was working out of his home.

At the least, it would have appeared to almost anyone that trial counsel was not paying a lot of attention to the case. Indeed, trial counsel was candid in acknowledging that he repeatedly indicated to defendant that he did not plan to do much work on the case until a month before the trial, whenever that date might be set: a representation that defendant never challenged or questioned.

As to deciding whether to plead, defendant represents himself as

37

being particularly passive. He knew that both his co-defendants were pleading guilty and had obtained some sorts of plea agreements. Yet, he did not push his attorney when the latter indicated that there would be no plea agreement for the defendant. Indeed, defendant always professed his innocence to his attorney and, given the latter's advice that there would likely be little difference in his sentencing outcome if he went to trial versus pleading guilty, always professed his desire to go to trial. In short, the testimony does not suggest that defendant ever expressed any real interest in pleading guilty.

This passivity exhibited by the defendant was quite at odds with the aggressiveness he showed during the fraud scheme and at trial. That is, defendant did not quietly accept co-defendant Shore's excuses for not repaying defendant's original investment, but was persistent in trying to get his money back. Once he realized that he had been duped by co-defendant Shore, defendant did not then go gently into the night. Instead, he joined in with Shore and Tuttle in an effort to infuse more cash from unwary victims into Shore's coffers, so that the defendant could be repaid. Indeed, defendant roped his life-long friend from childhood, Romano Baldelli, into investing a great deal of his money with Shore. The culmination of defendant's efforts was his willingness to pose as the owner of the condominium for the purpose of forging a quitclaim deed to the

38

latter's property.

Likewise, at trial, defendant took a very bold step in taking the stand to press a rather detailed alibi defense that he knew to be false. Not only that, he persuaded his wife to likewise testify falsely. The boldness of the step is underlined by the fact that the Court concludes that it was all the defendant's initiative, with no prodding or encouragement from his attorney, to so testify. In the Court's experience, such a decision demonstrates a moxie that few criminal defendants display.

It is therefore hard to square the defendant's aggressiveness during the fraud and at trial with the reticence and blind reliance that he now claims to have given to his trial counsel in the lead-up to the trial. Indeed, in the Court's experience, it is not uncommon for criminal defendants, whether with retained or appointed counsel, to write letters to the Court complaining when counsel seems to be insufficiently preparing for the defendant's case or otherwise behaving in an unsatisfactory or unresponsive manner. When that happens, the Court always addresses the matter to determine whether new counsel should be appointed. Yet, although it was defendant who chose his trial counsel, he never uttered a peep to anyone that trial counsel might need to be replaced or at least queried about his efforts.

This seeming passivity is perplexing because the defendant was

39

not a naif or a recent immigrant from a primitive society.  He had been in the real estate business and other businesses for a long time.  Indeed, at his habeas hearing, albeit perhaps an exaggeration, he claimed to have run several multi-million dollar businesses.  And he had recent experience with the legal system shortly before the filing of the present criminal charges, having undergone a civil trial in which his childhood friend, Mr. Baldelli, had sued the defendant for his role in duping Baldelli.[21]

Yet, as far as the Court is aware, there is no requirement that a defendant who alleges ineffective assistance of counsel demonstrate due diligence, or counter what would appear to be reckless indifference to his attorney's apparent shortcomings.  Nor does the Court intend by this discussion to suggest that it is importing such a standard.  Nevertheless, it is necessary to be aware of the above facts in order to make a reasoned assessment as to the likelihood that the proceedings would have been different had trial counsel properly advised the defendant that he could receive a somewhat

---

[21]   The defendant had not had major contacts with the criminal justice system, but he was not a newcomer to that system.  According to the presentence report, he had two convictions: one in 1990 for possession of a forged instrument, for which he peld guilty and received probation, and one for issuing a bad check in 1992, for which he was found guilty and paid a fine.  (PSR at 14-15, ¶¶ 48-49.)  He had been arrested in 1990 for criminal possession of a weapon, but the charge was dismissed and in 2004 for terroristic threats against a Jack Gloss, for which the charge was nolle prossed.  (*Id.* at 16, ¶¶ 55-56.)

AO 72A
(Rev.8/8
2)

lesser sentence if he pled guilty.  As explained below, the Court concludes that defendant has failed to make that showing.

     2.   <u>Conclusion That the Defendant Would Not Have Pled Guilty Merely to Obtain the Incremental Reduction in His Sentence that A Plea of Guilty Might Have Prompted</u>

To determine whether the defendant would have pled guilty had his trial counsel been knowledgeable about how the Sentencing Guidelines worked and had explained that defendant's sentence would likely be reduced somewhat by such a plea, one must examine the calculations that trial counsel would have presented to defendant in a colloquy concerning the sentencing advantages of a guilty plea versus a trial.  Had trial counsel gone through the necessary steps, he would not have wanted to understate any possible sentencing range and would have presumably calculated the Guidelines just as did the probation officer.  Thus, defense counsel could not have known that the defendant would be acquitted of one of the two counts for forging the quitclaim deeds and that the Court would therefore not hold the defendant responsible, as a co-conspirator, for the entire amount of loss.  Accordingly, counsel would have calculated the loss amount, as did the probation officer, as being 12 levels, which combined with the base offense level for fraud of 7, would have yielded an offense level of 19.

The probation officer also included a 2-level enhancement for use of sophisticated means.  A prudent defense attorney would have

41

likewise realized that this was also a possibility and so advised the defendant.  Adding in those two levels, would cause the offense level calculation to rise to a level 21.  Further, as did the probation officer, a prudent defense attorney would have recognized that the defendant would definitely be assessed a 2-level enhancement for use of a false identification document, with the corresponding offense level rising to a level 23.  An offense level of 23, with a criminal history category of I, yields a 46-57 month range.

In offering a comparison of sentencing probabilities with a guilty plea versus a trial, defense counsel would have advised the defendant that, utilizing the above calculations, he would likely receive a 3-level reduction for acceptance of responsibility off of the above 23-level calculation, should the defendant plead guilty. That subtraction would result in a level 20, which, with a Criminal History of I, would have yielded a sentencing range of 33-41 months. Yet, as set out above, using these same calculations, the sentencing range that would have resulted had defendant gone to trial and lost only the acceptance credit would have still yielded a sentencing range of 46-57 months.[22] In other words, the defendant would have been told that the swing between the reduced range resulting from a plea

---

[22] That is, this calculation does not factor in an enhancement for obstruction of justice as a result of defendant's perjury at trial.

42

would be only 13 months.  And under the plea scenario, the defendant would still be looking potentially at a 33-month sentence.[23]

Indeed, as explained below in note 24, even the best-case scenario for the defendant, looking prospectively at the range resulting from a plea of guilty would have been a 16/I,[24] which calls for a 21-27 month range.  Thus, a knowledgeable defense attorney would have advised the defendant that without a plea, he would be looking at a likely 46-57 month range, but with a plea he could still be looking at a 33-41 month range, and that even if all the stars aligned right, the defendant's best-case scenario was likely still at

_____

[23]  Now, of course, a prudent defense attorney would also tell his client that he would try his best to persuade the sentencing judge not to impose the 2-level enhancement for sophisticated means, but, of course, he could not guarantee that he would succeed.  And he likewise could have advised that he would have tried to obtain an mitigating role reduction for the defendant, but again could not have guaranteed this result either.  He would further advise the defendant that the Guidelines were not binding and therefore the defense counsel would argue for a variance and imposition of a lower sentence.  But, on that piece of advice, he would have to strongly caution the defendant that there could be no guarantees that the judge would vary from the Guidelines range.

[24]  It is true that this Court did reduce the loss amount by 2 levels, based on defendant's acquittal for one act of forgery, but that was based on the acquittal on one count, which would not have occurred with a straight-up plea to the entire indictment.  And the Court likewise declined to apply the 2-level enhancement for sophisticated means and chose to reduce the defendant's offense level by 2 levels for minor role.  So, assuming a 4-level reduction for the above two adjustments, the defendant would have been looking, under a best-case prognostication at Level 16, calling for a 21-27 month range.

least a 21-27 month Guidelines' range.

A cautious man, upon hearing the above advice, might well have entered a plea of guilty.  A contrite man might have done the same.  The Court concludes, however, that, at least at trial time, defendant was neither a contrite nor a cautious man.   In short, the Court concludes that, even had Mr. Siciliano given the defendant the above advice, the latter would have still rolled the dice and gone to trial to avoid a federal felony conviction.

In reaching this conclusion, the Court is mindful of a remark that it made at defendant's sentencing, which has been quoted during the habeas proceedings.  As discussed above, defendant became alarmed after conviction, when the Presentence Report indicated how much time he was facing at sentencing.  He then promptly fired Siciliano and hired Steven Sadow, a very experienced and respected criminal defense attorney.   Sadow, with the defendant's consent and acknowledgment, admitted that the defendant was guilty of forging the one quitclaim deed and that the defendant had, in fact, lied at trial.  From that point, he then proceeded to try to prevail on his objections as to the loss and sophisticated means enhancement and as to the failure to give the defendant a reduction of minor role.  He prevailed on all these objections, and greatly whittled down the defendant's sentencing range.   While the Court did not accede to counsel's request that defendant be given a variance and, thereby, sentenced to

44

24 months, the Court did, upon defendant's acknowledgment of guilt, sentence him to the low-end of the range: 30 months.

At that time, the Court made the comment referenced in habeas counsel's pleadings: "Mr. Denney, had you received the sage advice of someone like Mr. Sadow before we had this trial, I suspect you would be in a much better situation now." (Sentencing Hr'g Tr. [168] at 142.) The Court made that observation, in part, to reassure the defendant that he had made a good decision when he followed Mr. Sadow's advise to cease falsely contesting his guilt, and instead to acknowledge his guilt and express contrition. The Court feared that there might be buyer's remorse on defendant's part down the road and, with this comment, wanted to head off a baseless § 2255 on that ground against sentencing counsel.

But the Court also made the remark because it was true. Both Mr. Sadow and habeas counsel, Mr. Lovell, are highly-skilled criminal defense attorneys at the top of their game. Had defendant retained either of them, the undersigned expects that either man could have more persuasively explained to defendant the realities of the situation that he faced in deciding whether to go to trial or to plead guilty than could Mr. Siciliano, even had the latter been more knowledgeable about the Guidelines. But defendant did not retain Sadow or Lovell or request appointed counsel. He instead retained Mr. Siciliano and kept the latter notwithstanding repeated signals

45

that this might not be a good decision.  And given the determination
that defendant showed in participating in a fraud in order to
retrieve his money and the risks that he was willing to take to try
to sell a jury on his alibi story, the Court simply does not believe
that Mr. Siciliano possessed the experience or *gravitas* necessary to
persuade the defendant that a guilty plea represented the best
strategy available to him.  It is the defendant's burden to persuade
the Court that the outcome would have been different, but for
counsel's ineffective assistance, and he has failed to do so here.

Accordingly, for the above reasons, the Court **DENIES** defendant's
motion to vacate sentence [179].

## VI.  <u>CERTIFICATE OF APPEALABILITY ("COA")</u>

A federal prisoner may not appeal the denial of his § 2255
motion "unless a circuit justice or a circuit or district judge
issues a certificate of appealability under 28 U.S.C. § 2253(c)."
FED. R. APP. P. 22(b)(1).  Rule 11 of the Rules Governing § 2255 Cases
provides that "[t]he district court must issue or deny a certificate
of appealability when it enters a final order adverse to the
applicant."  A COA may issue "only if the applicant has made a
substantial showing of the denial of a constitutional right."  28
U.S.C. § 2253(c)(2).  A substantial showing of the denial of a
constitutional right "includes showing that reasonable jurists could
debate whether (or, for that matter, agree that) the petition should

46

have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000)(citations and quotation marks omitted).

The Court is not certain whether reasonable jurists would debate whether this petition should have been decided differently; that can sometimes be a close call when one is the person who has made the decision.   Yet, as the Court has found inadequate performance by trial counsel in some respects, but denied relief because of the absence of a showing of prejudice, it is possible that some might differ on that conclusion.   Thus, erring on the side of permitting the defendant to pursue further the present claim, the Court **GRANTS** a COA for the defendant to litigate the questions whether his trial counsel provided ineffective assistance of counsel as to the two areas discussed above in this Order (defendant's presentation of a false alibi and defendant's decision to go to trial rather than to plead guilty) and whether that ineffective assistance warrants a new sentencing hearing.

**VII.** <u>**CONCLUSION**</u>

For the foregoing reasons, Defendant's motion to vacate sentence [179] is **DENIED**.   Defendant is **GRANTED** a certificate of appealability as set out above to all of his claims.   The Court continues Defendant's bond until he decides whether he wishes to appeal.

47

**SO ORDERED** this 8th day of April, 2014.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/8
2)